**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**AT PIKEVILLE**

**CRIMINAL CASE NO. 10-10-GFVT-CJS**
**CIVIL CASE NO. 15-7404-GFVT-CJS**

**UNITED STATES OF AMERICA**                                      **PLAINTIFF**

**v.**                        **REPORT & RECOMMENDATION**

**MICHAEL D. LEMAN**                                      **DEFENDANT**

**\*\*\*  \*\*\*  \*\*\*  \*\*\***

Defendant, Michael Leman has filed a Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255.  (R. 300).  The United States filed a Response to Defendant's § 2255 Motion (R. 314), and Defendant filed a Reply.  (R. 324).  Having all relevant documents before the Court, the matter is ripe for consideration and preparation of a Report and Recommendation. 28 U.S.C. § 636(b).  For the reasons stated below, it will be herein **recommended** that Defendant's § 2255 Motion (R. 300) be **denied**.

I.      **FACTUAL AND PROCEDURAL HISTORY**

Between 2000 and 2007, Defendant Leman, a businessman, opened pain management clinics, known as "Urgent Care" clinics, in several states including Pennsylvania and Ohio.  *See United States v. Leman*, 574 F. App'x 699, 701 (6th Cir. 2014) (opinion on direct appeal describing case facts); (R. 158, at 10-23).  Leman hired a former business associate, Stephen Lyon, to assist with the "business side" of the clinics.  *Id.*  Mr. Lyon reported patient numbers and revenue to the Defendant on a daily basis.  *Id.*  Patients from Kentucky traveled in groups of up to 25 or 30 to Defendant's clinic in Philadelphia to receive pain medication.  *Id.*  Similarly, 80% of patients of

1

Defendant's Cincinnati clinic were from Kentucky, despite the six or seven hour drive from Eastern Kentucky. *Id.* at 702. At trial, former doctors of Defendant's clinics testified that they brought up concerns with Leman regarding the number of patients from Eastern Kentucky and the large dosages of pain medication being prescribed, with one doctor resigning after less than three months on the job. *Id.* at 701-02.

On May 20, 2010, a federal grand jury in the Eastern District of Kentucky indicted Leman for conspiracy to knowingly and intentionally distribute oxycodone and methadone, Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (R. 16). On September 1, 2011, the grand jury returned a Superseding Indictment adding Urgent Care of Philadelphia, Inc. and Urgent Care of Cincinnati, Inc., d/b/a Urgent Care Services, L.L.C. as defendants and adding an additional count of conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(h). (R. 85). The Superseding Indictment also added a forfeiture allegation for Defendants' gross proceeds amounting to $1,000,000 dollars for each count. (*Id.*). The grand jury issued a Second Superseding Indictment on March 1, 2012 further clarifying the Urgent Care entity defendants. (R. 123).

At the arraignments for the initial indictment and two superseding indictments, Leman pleaded not guilty to each count. (R. 24; R. 29; R. 96; R. 128). Trial began on March 5, 2012 (R. 132) and the jury returned a guilty verdict as to both counts on March 27, 2012 (R. 167). The jury, on a special verdict form, found forfeiture as to the Defendant inappropriate. (R. 168).

A Presentence Investigation Report ("PSR") prepared for Defendant Leman noted consideration of, among other factors, the aggregate amount of methadone prescribed by doctors at the Urgent Care clinics (R. 225, at 13-14), resulting in a base offense level of 38, which was increased to 43 based on "special offense characteristics," Defendant's lead role in the conspiracy,

and obstruction of justice. (*Id.* at 16). The Sentencing Guidelines range in Defendant's PSR was "life," however the maximum statutory sentence for each count was 20 years' imprisonment. (*Id.* at 36). The maximum fine was $1,000,000 for Count 1 and $500,000 for Count 2. (*Id.* at 37).

On August 10, 2012, Defendant was sentenced to 180 months in prison on each Count, to be served concurrently, and was also ordered to pay $1,000,000 in community restitution. (R. 223). The judgment was affirmed on direct appeal by the Sixth Circuit on July 31, 2014. *Leman*, 574 F. App'x 669. On June 25, 2015, Defendant filed the pending Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255, asserting the following four claims all based on ineffective assistance of counsel:

> (1) Leman's trial lawyers were ineffective in failing to inform him that he could be convicted of drug crimes on proof that he was 'knowingly indifferent' to the clinics' unlawful activities or 'deliberately ignorant' of the activities;
>
> (2) Leman's trial lawyers were ineffective in failing to review the Kentucky patients' medical records before trial;
>
> (3) Leman's trial lawyers were ineffective in failing to recall Snook after discovering her forgery; and
>
> (4) Leman's trial lawyers were ineffective by failing [to] advise him in a timely fashion of the sentencing guidelines so as to allow him to make an informed decision as to whether to enter into the government's offered plea agreement of one year and a day.

(R. 300; R. 324, at 1).

## II.    ANALYSIS

Under § 2255, a federal prisoner may seek habeas relief on grounds that his conviction or sentence violated the Constitution or laws of the United States, that the court was without jurisdiction to impose the sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a). A § 2255 motion

does not have to be founded on constitutional error or even federal law. *Watt v. United States*, 162 F. App'x 486, 502-03 (6th Cir. 2006). However, to succeed on a § 2255 motion alleging constitutional error, a defendant "must establish an error of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1996) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)). A defendant must prove his allegations by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

As noted above, all four of Defendant's claims allege ineffective assistance of counsel. The Sixth Amendment provides "in all criminal prosecutions, the accused shall enjoy the right to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. In order for an attorney's assistance to be constitutionally sufficient, it does not have to be free from error. *McMann v. Richardson*, 397 U.S. 759, 771-74 (1970). Rather, "the right to counsel is the right to the effective assistance of counsel." *Id.* at 771 n. 14. Ineffective assistance of counsel occurs when counsel's performance falls below that of a "reasonably competent attorney." *Id.* at 770-71. The United States Supreme Court in *Strickland v. Washington*, held that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. 668, 686 (1984).

The Supreme Court in *Strickland* established a two-part test to determine whether a criminal defendant has been deprived of effective assistance of counsel, requiring a showing of (1) constitutionally deficient performance and (2) prejudice. *Id.* To meet the first prong, a defendant must show by a preponderance of the evidence that counsel's representation was so deficient that it fell "below an objective standard of reasonableness" as measured under "prevailing professional

norms" and evaluated "considering all of the circumstances." *Id.* at 687-88. The defendant must demonstrate this by pointing to specific errors in counsel's performance, and the reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. The right to effective assistance of counsel extends to the plea bargaining process, and "[i]f a plea bargain is offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler v. Cooper*, 566 U.S. 156, 162-68 (2012).

Judicial scrutiny of counsel's performance is "highly deferential," consisting of a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In addition, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

To meet the second prong of the *Strickland* test, a defendant must show that counsel's constitutionally deficient performance actually prejudiced the defense, and, as a result, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the plea-bargaining context, where a defendant is claiming ineffective advice led him to reject a plea bargain and proceed to trial, he must show that:

> but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 566 U.S. at 164 (2012); *Magana v. Hofbauer*, 263 F.3d 542, 547-48 (6th Cir. 2001). When evaluating prejudice, courts generally must take into consideration the "totality of the evidence before judge or jury." *Strickland*, 466 U.S. at 695.

Defendant must prove both prongs of the two-prong *Strickland* test to meet his burden of establishing that his trial counsels' assistance was constitutionally ineffective. *Id.* at 697. While a defendant must prove each element of the two-part *Strickland* test to establish an ineffective assistance of counsel claim, courts are not required to conduct an analysis under both *Strickland* prongs. *Id.* Courts may approach the *Strickland* analysis in any order, and an insufficient showing on either prong ends the inquiry; if the Court finds that Defendant cannot meet one *Strickland* prong, it need not address the second. *Id.*

### A.    Failure to advise on the "deliberate ignorance" theory

Leman first claims his trial counsel's assistance was ineffective as counsel allegedly provided him "an incorrect legal rule" by informing him the Government had to prove actual knowledge and by failing to inform him of the concept of "deliberate ignorance." (R. 300-1, at 8-9). The Defendant asserts that had counsel informed him, before he rejected the Government's plea offer, that he could be convicted under a deliberate ignorance theory, he would have accepted the offer of a "year-and-a-day prison sentence and a fine" rather than proceed to trial resulting in a conviction and fifteen-year prison sentence. (R. 300-1, at 10).

Leman more specifically claims his trial counsel "repeatedly" told him "all [he] was guilty of was ignorance . . . and that was not a crime" explaining that "the prosecution would have to prove beyond a reasonable doubt, that [he] was guilty of actually knowing what was going on in

the Urgent Care clinics . . . ."  (R. 300-2, at 2).[1]  Defendant further claims that it was only after

rejecting the Government's plea offer, and in the final days of trial, that he learned of the

"deliberate ignorance" concept when the Court indicated it would include a "deliberate ignorance"

jury instruction.  (*Id.* at 3; R. 300-1, at 9).  The "deliberate ignorance" instruction given by the

District Court reflected the Sixth Circuit Pattern Criminal Jury Instruction § 2.09 and stated as

follows:

> No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you're convinced that a defendant deliberately ignored a high probability that drugs were being distributed illegally or money was being laundered, then you may find that he knew that drugs were being distributed illegally or money was being laundered.
>
> But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of the high probability that the drugs were being illegally distributed or money was being laundered, and that the defendant deliberately closed his eyes to what was obvious. Carelessness or negligence on his part is not the same as knowledge, and it's not enough to convict.

*Leman*, 574 F. App'x at 705 (affirming lower court's inclusion of the deliberate ignorance jury

instruction); (R. 203, at 183).  Defendant clarifies in his Reply brief that he is not necessarily

claiming counsel was ineffective for failing to inform him of the deliberate ignorance instruction

in advance, but more broadly for failing to inform him of the deliberate ignorance concept and

assuring him that ignorance alone would be insufficient for a conviction.  (R. 324, at 3).

Although there is no evidence of a written plea offer in the record, it is undisputed that the

Government offered Mr. Leman a "plea deal of a felony conviction, one year and one day in jail

and a fine."  (R. 300-2, at 2).  Based on Leman's first affidavit and the affidavit of Attorney Gold,

---

[1] In addition to his own affidavit, Leman submitted an affidavit of Attorney Tracy Gold who served as corporate counsel in the case as well as Leman's personal counsel for private/domestic matters. (R. 300-2). Leman attached to his Reply a second affidavit of himself (R. 324-3) and an affidavit of his son, James Leman, who sometimes accompanied his father to meet with counsel and was present at various stages of the case (R. 324-4).

who served as corporate counsel in the case and handled domestic matters for Leman, the offer was made at some point during trial, which began on March 8, 2012. (*Id.*; R. 300-3, at 3). The billing records of Attorneys Simmons and Burns reference "plea negotiations" on March 8, 2012 and also include an entry dated March 23, 2012 stating, "Telephone conference with Client regarding plea; Telephone call to opposing counsel regarding plea; Correspondence to Client and Counsel regarding plea . . ." (R. 324-4, at 16). This was just three days before the last day of trial on March 26, 2012, the same day the jury instructions were given. Thus, although Leman's Reply states the offer of a year and a day was made "[e]ither prior to or during the early trial stages," the record suggests the offer was made at some point during trial, with continued negotiations occurring three days prior to the close of trial. (*Id.*).

In the affidavits attached to the Government's Response, Leman's trial attorneys do not rebut or deny having made the alleged statements that ignorance is insufficient for conviction or that the Government would have to prove actual knowledge. Attorneys Simmons and Burns also do not deny the allegation that they never specifically discussed the deliberate ignorance or willful blindness concept with Leman and its possible application to his case. (Simmons Aff. R. 314-2, at 4) ("I do not recall using the terminology 'deliberate ignorance' until such time as it was actually part of the jury instructions tendered by the government."); (Burns Aff. R. 314-1, at 2) ("During the trial of this matter and prior to trial, I do not specifically remember discussing a possible jury charge of 'knowing indifference' with Mr. Leman.).

However, Attorney Simmons asserts that he did discuss the concept of "blind indifference" to the extent that he suggested to Leman he could plead guilty under a theory of "blind indifference" like his former employee, Mr. Lyon. (R. 314-2, at 4) ("I suggested to Mr. Leman, during our discussions of a possible plea that Lyon's trial testimony was under the concept of

'blind indifference . . . I informed Mr. Leman that if he did enter a plea he could likewise suggest the 'blind indifference' concept in such a plea of guilty."). This is corroborated by the affidavit of Leman's other attorney, Mr. Burns. (R. 314-1, at 2) ("It was my understanding that Mr. Simons had discussed, in general terms, the fact that the former employee, Mr. Lyon, had used that as the reasoning for why he was pleading guilty in this matter."). However, Leman claims these affidavits are "inaccurate" and denies that either of his attorneys commented on Mr. Lyon's "blind indifference" testimony. (R. 334-2, at 2).

As discussed above, to make out a Sixth Amendment claim of ineffective assistance of counsel, a defendant must first demonstrate by a preponderance of the evidence that counsel's performance fell below an "objective standard of reasonableness" or, said another way, that "counsel's errors were so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. *Strickland*, 466 U.S. at 667-68. In the plea bargaining context, the Sixth Circuit has held that the right to effective assistance of counsel means that "[a] criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure conviction [and] discuss the evidence as it bears on those elements . . . ." *Smith v. United States*, 348 F.3d 545, 552-53 (6th Cir. 2003). The Sixth Circuit has also recognized that an attorney's "complete ignorance of the relevant law under which his client was charged" and "gross misadvice" during the plea bargaining process may constitute ineffective assistance. *Magana*, 263 F.3d at 550.

Even assuming Leman's counsel did not discuss the concept of "deliberate ignorance" or "deliberate indifference" with him in any context, this omission coupled with the advice that the Government would have to prove actual knowledge do not amount to ineffective assistance. First, counsel's statements that ignorance would be insufficient for a conviction do not constitute a

9

misstatement of the law. *Leman*, 574 F. App'x at 705.  In a similar case, the United States District Court for the District of Maryland denied petitioner's claim of ineffective assistance of counsel for "failing to effectively warn him of the potential application of the willful blindness standard" thereby "failing to provide him a clear understanding of the reasonableness of the government's offer." *Poole v. United States*, No. RDB-08-0098, 2013 WL 594690, at *12-13, 2013 U.S. Dist. LEXIS 20847 (D. Md. Feb. 15, 2013).   In that case, the petitioner claimed counsel should have explained that "under a willful blindness theory 'could have known' equates to 'should have known.'" *Id.* at *12.  However, the court noted that such advice, if given, would have been inaccurate, since under a willful blindness theory, the jury would have to find that petitioner "purposefully closed his eyes to avoid knowing what was taking place around him." *Id.* at *13.

Similarly, Leman claims counsel misadvised him by telling him that ignorance was not sufficient for a conviction.  However, if they had told him the opposite – that ignorance was sufficient – that would have been inaccurate, since the willful blindness or deliberate ignorance instruction does not "lower[] the mental state" for crimes with a knowledge requirement.  *United States v. Agbebiyi*, No. 11-cr-20076, 2016 WL 7229975, at *5-6, 2016 U.S. Dist. LEXIS 172660 (E.D. Mich. Dec. 14, 2016) (rejecting defendant's ineffective assistance of counsel claim for failing to object to a deliberate ignorance jury instruction where defendant was charged with "knowingly and voluntarily joining [a] conspiracy").  At the close of Leman's trial, the Court provided the jury with instructions describing the charge of conspiracy to "knowingly and intentionally" distribute oxycodone and methadone.  (R. 203, at 81).  The deliberate ignorance jury instruction did not negate the *mens rea* requirement for the conspiracy to distribute charge, and therefore Leman's counsel did not misstate the law when they informed him "simple ignorance" was insufficient for a conviction.  (R. 124-2, at 2).

10

Second, although it may have been prudent for counsel to explain the possibility of a "deliberate ignorance" jury instruction or to explain to Leman that he could not escape conviction for "knowingly and intentionally" distributing oxycodone and methadone by "turning a blind eye to [ ] obviously criminal conduct," *Leman*, 574 F. App'x at 705, this omission does not rise to the level of constitutional deficiency. *Burger v. Kemp*, 483 U.S. 776, 794 (1987) ("[I]n considering claims of ineffective assistance of counsel, we address not what is prudent or appropriate, but only what is constitutionally compelled.") (internal quotation omitted).

Defendant argues the misadvice counsel provided in *Lafler*, where the attorney advised his client that the prosecution could not prove intent to murder despite the defendant having shot at the victim's head, instructs that the alleged misadvice Leman's trial attorneys provided similarly constitutes deficient performance. 566 U.S. at 160-61. However, in *Lafler*, all parties stipulated that counsel's advice was constitutionally ineffective, and thus, although the Court expressed doubt as to whether counsel's performance was deficient, it did not address the first prong of the *Strickland* test. *Id.* at 172-74.

In addition, unlike in *Magana v. Hofbauer*, where counsel admitted to being "complete[ly] ignorant" of the fact that his client was facing two *consecutive* rather than *concurrent* 10-year sentences, 263 F.3d at 539, here, evidence in the record suggests that counsel were familiar with the deliberate ignorance concept and were aware that a deliberate ignorance jury instruction may be given. In addition to Attorney Simmons's affidavits in which he states that he was aware of the deliberate ignorance instruction based on his prior legal experience (R. 314-2, at 1), Leman's counsel submitted the Sixth Circuit pattern deliberate ignorance instruction *in their own proposed jury instructions* prior to trial. (R. 117, at 14). And while Leman describes at length how counsel's billing records demonstrate a lack of preparedness on this issue (R. 324, at 4-5), the record is at

11

best inconclusive.  There are several entries prior to the charge conference on March 26, 2012 referring to review, research, or discussions regarding the proposed jury instructions, with one entry referring to "willful blindness" in particular (*see, e.g.*, R. 324-5) (entry by Attorney Burns March 23, 2012 "Conference with Co-counsel and paralegal regarding instructions . . . Review of Legal Research regarding willful blindness; Conference with Co-counsel regarding instructions . . .").

Furthermore, the transcript of the charge conference demonstrates that Attorneys Burns and Simmons had researched the issue in advance and came prepared to support their objection to the instruction.  (*See* R. 203, at 22-24) (Mr. Simmons cites to Tenth and Eleventh Circuit cases and notes he was unable to find a Sixth Circuit case that was factually similar to Leman's case). As Mr. Simmons argued at the charge conference, counsel did not originally see a harm in including the deliberate ignorance instruction; but based on the evidence at trial, they believed it would be confusing to the jury in light of the prosecution's presentation of the case under an "actual knowledge" theory.  (*Id.* at 35); *see Pham v. United States*, No. 9 Civ. 11613 (WHP), 2005 WL 3307060, 2005 U.S. Dist. LEXIS 31252 (S.D.N.Y. Dec. 7, 2005) (rejecting petitioner's ineffective assistance of counsel claim for attorney's failure to explain the willful blindness theory, because based on discussions with the defendant, counsel "had no reason to believe that [defendant] consciously avoided learning" about the criminal conduct  "or that the Government would pursue such a theory"); *see also Strickland*, 466 U.S. at 689 ("fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Thus, although Leman alleges his trial counsel were not aware of the possibility of a deliberate ignorance jury instruction (R. 300-1, at 10; R. 300-3, at 2), the evidence of legal research in advance of the charge conference as well as the transcript of the charge conference demonstrate an awareness of the instruction and concept.  While counsel may not have fully appreciated the likelihood of the District Court including the instruction or the harm to a chance of acquittal such an instruction could have in Leman's case based on Sixth Circuit caselaw and the evidence presented at trial, this error in judgment, apparent in hindsight, does not render counsel's performance ineffective.  Considering the above circumstances, Attorneys Burns and Simmons's failure to specifically discuss the deliberate ignorance concept with Leman in terms of it appearing as a jury instruction or its general applicability to his case, as well as their statements to the effect that ignorance is not a crime, does not amount to constitutionally unreasonable assistance.

Even if counsel's failure to explain deliberate ignorance to Leman prior to his rejection of the Government's plea offer was unreasonable, Leman does not adequately support his assertion that but for the alleged misadvice there is a "reasonable probability" he would have accepted the Government's plea offer rather than proceed to trial.  The fact that Leman made no indication he was interested in re-engaging in plea negotiations after learning of the deliberate ignorance jury instruction at the charge conference where it was argued at length in his presence, suggests that even if he had been informed of the concept sooner, he would still have rejected the offer. (Simmons Aff. R. 314-2, at 4) ("There was no discussion about reinstituting any plea discussions based on the proposed jury instruction request"); *Torres-Lopez v. United States*, No 1:03-cr-163-1, 2012 WL 4510923, at *6-7, 2012 U.S. Dist. LEXIS 140808 (E.D. Tenn. Sept. 28, 2012) (finding petitioner failed to prove prejudice under *Strickland* where he acknowledged awareness of the sentence and requirements of the offense and did not take the opportunity to withdraw his guilty

plea).  Although Leman did not become aware of the deliberate ignorance concept until at the charge conference on the last day of trial (at the latest), Attorney Simmons's billing records indicate plea negotiations were ongoing just three days prior.  Therefore, it is reasonable to treat Leman's failure to attempt to re-engage in plea negotiations after the charge conference as an indication that he would not have accepted the plea offer even if he had been aware of the deliberate ignorance concept.

Leman asserts that he was "open to a plea and settlement" because he "offered before trial . . . to plead to 2 misdemeanors of one year to serve each."  (R. 324-2, at 2).  However, this offer, which there is no evidence of in the record, does not demonstrate a willingness to plead guilty to a felony charge.  Leman acknowledges in his affidavit the Government rejected his offer to plead guilty to two misdemeanors, recognizing the Government "want[ed] a felony conviction."  (*Id.*).  The probation officer's Statement of Reasons sheds further light on Leman's decision to reject the plea offer stating: "Leman declined to enter a plea, mainly due to the stigma of a felony conviction and his feared impact of such on the custody of his minor children."  (R. 226, at 3).

According to Mr. Burns, after advising Leman he was facing up to twenty years in prison and discussing the possibility of a guilty plea on the basis of knowing indifference, Leman, "who was adamant that he had no knowledge of the criminal activity" decided to continue with the trial.  (R. 314-1, at 2).  Thus, Leman's alleged offer to plead to misdemeanor charges does not demonstrate a plausible indication we would have been willing to accept a felony conviction had he been informed of the deliberate ignorance theory.

Lastly, Leman fails to demonstrate counsel's alleged misadvice prejudiced him, because Leman rejected the Government's offer *against* the advice of counsel who "urg[ed]" him to accept the deal "in the strongest terms."  (Burns Aff. R. 314-1, at 2); *see e.g.*, *Mills v. Warren*, 436 F.

App'x 506, 512-13 (6th Cir. 2011) (finding the prejudice prong not met in part because defendant rejected a plea offer against the advice of counsel); *United States v. Miller*, No. 3:07 CR 569, 2015 WL 5173026, at *3, 2015 U.S. Dist. LEXIS 117970 (N.D. Ohio Sept. 3, 2015) ("[D]efendant has not demonstrated *Lafler* error because he has not shown that [counsel] encouraged him to reject the plea agreement and proceed to trial.").

Leman's first claim of ineffective assistance of counsel fails under both prongs of the *Strickland* test, as he is unable to demonstrate counsel's alleged misadvice on the deliberate ignorance theory amounted to constitutionally deficient assistance. Leman also fails to demonstrate a reasonable probability that had he been fully informed on the theory, he would have accepted the Government's plea offer to plead guilty to a felony.

### B. Misadvice on application of Sentencing Guidelines and maximum statutory penalties

Leman includes a second claim alleging ineffective assistance of counsel with respect his counsel's advice prior to trial, this time alleging counsel failed to advise him on "the application and implications of the U.S. Sentencing Guidelines," particularly failing to inform him the court could accumulate the quantity of drugs prescribed by the doctors for purposes of calculating his sentence.[2] (R. 300, at 8). In an affidavit attached to his Motion to Vacate, Leman further alleges "[d]espite my repeated requests for Mr. Simmons and Mr. Burns to tell me the maximum amount of jail time I could get if convicted, and how it could be calculated, all they told me was it could be up to 20 years, but most likely would be eight." (R. 300-2, at 3).

While Leman asserts in his reply brief that had counsel informed him of the application of Sentencing Guidelines to his case, he would have accepted the government's offer (R. 324, at 5),

---

[2] This claim is presented as "Ground Four" in Leman's Motion to Vacate, however it is discussed second due to the fact that like the first claim, it involves advice given by counsel during the plea bargaining process.

Leman fails to make any assertion of prejudice in his Motion to Vacate, the Memorandum submitted in support of his Motion, or in the affidavit attached as an exhibit to the Motion.  In fact, the Memorandum does not address the claim regarding application of the sentencing guidelines, identified as "Ground Four" in the Motion to Vacate, *at all*, instead plainly stating that Leman "details *three ways* in which his trial lawyers failed to provide him with ineffective assistance of counsel."  (R. 300-1, at 1) (emphasis added).

The Sixth Circuit has repeatedly held that an argument raised for the first time in a reply brief is considered waived.  *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (denying habeas relief based on sufficiency of the evidence claim raised for the first time in reply brief, finding "no reason to excuse" the defendant's failure to make an argument in his opening brief which he had previously acknowledged in another filing); *Am. Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004) (declining to consider argument raised for the first time in reply noting the defendant had "actually raised" the argument before the district court, "but chose not to include it in its 67-page opening brief."); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (noting the Sixth Circuit "has found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses."); *United States v. Hough*, 276 F.3d 884, 891 (6th Cir. 1996) (holding that when a party fails to adequately brief a claim, the court may consider the claim abandoned) (citing *Bikel v. Korean Air Lines Co.*, 9 F.3d 151, 154 (6th Cir. 1996)).

Because Leman failed to assert the requisite element of prejudice and failed to address the claim of ineffective assistance resulting from a lack of advice on the applicable sentencing guidelines or maximum potential sentence in a meaningful way until the filing of his Reply, this claim is waived.  The fact that Leman was represented by counsel when he filed his Motion to

16

Vacate and supporting documents, and that the claim was identified in the Motion but inexplicably ignored in the Memorandum renders these omissions inexcusable.

Even if Leman's claim that his trial counsel were deficient due to a failure to adequately explain application of the sentencing guidelines or maximum sentence were not waived, the claim would fail on the merits. In the plea bargaining context, the Sixth Circuit has held "a criminal defendant has a right to expect at least that his attorney will . . . explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available" and that "[i]n a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time." *Smith*, 348 F.3d at 553; *Pough*, 442 F.3d at 966 ("A defendant challenging his attorney's conduct during plea bargaining . . . must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence.").

At bottom, Leman has failed to demonstrate either based on evidence or the record that his trial counsel neglected to adequately inform him of the likely sentence he would face upon conviction based on the statutory maximums and Sentencing Guidelines. On one hand, Leman claims "at no time" until after his conviction did counsel "even mention the Sentencing Guidelines," and "despite repeated requests" counsel failed to tell him the "maximum amount of jail time" he could receive if convicted. (R. 300-2, at 3; R. 324-2, at 1). On the other hand, Leman concedes, "Mr. Simmons did tell me I could not receive a life sentence because that would exceed the statutory maximum sentence. And he did tell me generally before trial that I could get as much as 20 years . . . ." (R. 324-2, at 1). He similarly states in his first affidavit, "all they told me was it could be up to 20 years, but most likely would be eight." (R. 300-2, at 3). That counsel gave

him information on his potential sentence is corroborated by Attorney Burns's affidavit, which states, "I do specifically remember . . . advising [Mr. Leman] that he was facing a sentence of as much as twenty years in prison . . ."  (R. 314-2, at 6).  Attorney Simmons's affidavit provides further details on sentencing discussions with Mr. Leman: "I had discussions with Mr. Leman one night at the hotel, as a follow-up to Mr. Burns independent discussions with Mr. Leman about a plea of guilty to avoid the exposure of a adverse trial verdict.  The parade of 'drug victim' witnesses at trial was an aggravating factor for sentencing and we were concerned about this evidence leading to an aggravated sentence."  (*Id.* at 3-4).

Although the Government did not have an opportunity to respond to this allegation, argued for the first time in Leman's Reply, based on the above statements from counsel and admissions by Leman, it is apparent that Leman did have discussions with counsel on the sentence he was facing, with reference to the "statutory maximum" (R. 324-2, at 1) and possible "aggravating factor[s]."  (R. 314-2, at 3-4).

Finally, Leman's statements that "Mr. Simmons did tell me I could not receive a life sentence because that would exceed the statutory maximum sentence.  And he did tell me generally before trial that I could get as much as 20 years . . . ."  (R. 324-2, at 1) accurately reflect the statutory maximums and ultimate sentence Leman was facing as contained in his PSR.  The PSR states that although the guideline range is "life" based on a total offense level of 43 and criminal history category of I, the sentence is capped at the statutory maximum of twenty years for each count.  (R. 225, at 36).  Leman has simply not met his burden of demonstrating counsel's advice with respect to the sentence he was facing was unreasonable.

Even assuming counsel misadvised Leman with respect to the calculation of the Guideline range and/or the statutory maximum penalty, Leman fails to demonstrate there is a reasonable

probability that but for counsel's errors, he would have accepted the Government's plea offer of a year-and-a-day. *Lafler*, 566 U.S. at 167. Considering Leman was aware he was facing "as much as twenty years" in prison (R. 324-2, at 1) and declined an offer to plead guilty in exchange for a sentence of just over one year, there is not a "reasonable possibility" that more detailed information from counsel on how his sentence would be calculated or that he could be facing a sentence of more than twenty years would have altered this decision. *See Moore v. United States*, 676 F. App'x 383, 386 (6th Cir. 2017) ("Given the substantial difference between 140 months and 480 months or life, there is no reason to believe the change in statutory maximum from life to forty years would have been decisive in a rational defendant's calculus in deciding whether to plead guilty under the plea agreement.").

Furthermore, that Leman was not informed of the maximum penalty at some point during the course of his case – by Mr. Simmons, Mr. Burns, his corporate counsel, or the court – is simply not plausible. The Minute Entry Orders for each of Leman's three arraignments indicate that Leman had been provided a copy of the indictment. (R. 24; R. 360; R. 128). The latter two indictments both contain penalty sheets indicating that for each count (conspiracy to distribute oxycodone and methadone and money laundering) the maximum sentence is 20 years' imprisonment. (R. 85, at 6; R. 123, at 7).

As discussed above, Leman rejected the plea offer *against the advice of counsel*. While Leman may have been more greatly persuaded to follow counsel's advice had he known he could be facing greater than twenty years, the fact that he did not heed their advice when considering a plea twenty times less than his potential sentence strongly suggests he would have made the same decision. *See Mills*, 436 F. App'x at 512-13 (6th Cir. 2011); *Miller*, No. 3:07 CR 569, 2015 WL 5173026, 2015 U.S. Dist. LEXIS 117970. Also relevant is Leman's unwillingness to plead to a

felony conviction, as demonstrated by his alleged offer to plead to two misdemeanor charges and his desire to avoid the stigma and child custody consequences of a felony conviction, as well as his insistence on having no knowledge of what was occurring at the clinics.  (R. 324-2, at 2; R. 226, at 3; R. 314-1, at 2).  Taken together, the record and briefing do not demonstrate a reasonable probability that Leman would have accepted the plea offer, even assuming he was fully advised on the potential sentence he was facing.

In summary, Leman has not met his burden of demonstrating counsel did not provide information on his estimated sentence under the Guidelines or that they did not inform him of the maximum statutory sentence he could face upon conviction.  Leman has also not provided support for his assertion there is a reasonable probability that he would have accepted the Government's plea offer, had he been fully informed.

### C.   Failure to review medical records before trial and failure to recall witness

Leman's final two claims are interrelated and will therefore be addressed in tandem. Leman first asserts counsel were ineffective for failing to properly investigate the facts of his case by not reviewing all of the clinic patient medical records in advance of trial.  (R. 300-1, at 2; R. 300-2, at 3).  He argues that had counsel reviewed the records, they would have discovered that clinic employee, Tonya Snook, forged documents in patient files, and thus would have been able to discredit her testimony by questioning her about the apparent forgery during cross-examination. (R. 300-1, at 2, 13).  Relatedly, Leman claims counsel were ineffective for failing to recall Snook after discovery of the alleged forgery during trial, again, missing an opportunity to question Snook about the forgery to discredit her testimony while she was on the stand. (R. 300, at 2; R. 300-1, at 2, 14-15).

There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and courts apply a particularly "heavy measure of deference" to counsel's strategic decisions or judgments. *Strickland*, 446 U.S. at 689, 691. While counsel have a recognized "duty to make reasonable investigations," decisions to limit investigations do not render counsel incompetent "to the extent that reasonable professional judgments support the limitation on investigation." *Id.* In addition, counsel generally enjoy "discretion over deciding which witnesses to call and how to examine them." *Carter v. Mitchell*, 829 F.3d 455 (6th Cir. 2016); *see also Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012) ("[w]hether to call a witness and how to conduct a witness' testimony are classic questions of trial strategy that merit *Strickland* deference.").

In addition to proving his trial counsel were constitutionally deficient for their alleged failure to review all of the patient medical records and refusal to recall Snook, Leman must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 446 U.S. at 694. Leman has failed to demonstrate that counsel did not review the patient medical records, but even if they had not reviewed all of the medical records, that decision does not render counsel's performance ineffective. In his affidavit, Leman claims "no one" from his attorneys' offices "reviewed *all* of the clinic records for the Kentucky patients." (R. 300-2, at 3) (emphasis added). His personal counsel, Tracy Gold, asserts "No one from the offices of Hailey McNamara ever reviewed the clinic records of the Kentucky patients until Trial when investigator Mr. James Bagwell reviewed them and uncovered the forgery by the United States key witness, Tonya Snook." (R. 300-3, at 3). Mr. Leman's son, who sometimes accompanied his father to the law office, alleges he heard Gold warn counsel that she believed some of the patient files were forged because they contained

21

identical MRIs. (R. 324-4, at 1). However, Gold does not corroborate having discovered the alleged forgery before trial or having informed counsel about it.

On balance, it appears Attorneys Burns and Simmons did indeed spend time reviewing the medical records, while also relying on staff to organize and analyze the files. Attorneys Burns and Simmons assert in their affidavits, "all of the medical records supplied by the government in its warehouse discovery responses were reviewed by counsel and/or staff" (R. 314-1, at 1) and "upon obtaining the files, extensive analysis of the patient records began." (R. 314-2, at 1). Burns and Simmons detail the analysis done on the records, including tracing which patients were seen by both clinics and creating a timeline "to show the flow of patients and who treated them." (*Id.*). Simmons also contradicts Gold by stating he was the one who discovered the forgery – not the investigator. (*Id.* at 2). Additionally, the billing records attached to Defendant's Reply list several entries relating to review of files and discovery. (*See, e.g.*, R. 324-4, at 9, 10) (two entries by Burns on March 2, 2012 both stating "Review of Discovery" and entry of Simmons on March 2, 2012, stating "Receipt and review of U.S. attorney products").

Leman has failed to demonstrate counsel did not review the patient medical records, and thus counsel's investigation with respect to the records was reasonable. Even if counsel did not review *all* patient records, there was certainly a substantial amount of review and analysis done on the records by counsel, staff, and Attorney Gold. This is corroborated by the attorneys' affidavits, the affidavit of James Leman who describes the processing of the files, as well as counsel's billing records.

It is also unclear how the outcome of Leman's trial would have been different, even assuming counsel did examine each file. As counsel explain, they only became aware of the significance of the particular records leading to the discovery of the identical records after the

testimony of a patient at trial. (R. 314-2, at 2). That the alleged forgery was less than obvious is also demonstrated by the Defendant's concession that the Government did not knowingly present perjured testimony, only claiming that "it knew it at the conclusion of the case." *Leman*, 574 F. App'x at 703. Therefore, even if counsel reviewed each medical file, it is not certain they would have discovered the alleged forgery.

Counsel's decision not to recall Snook falls within the category of a reasonable trial strategy. *Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012). As outlined by counsel, there were numerous, plausible reasons not to recall Snook to directly question her about the alleged forgery, including her "alleged improper sexual contact with Mr. Leman," the likelihood of Snook simply denying the forgery, and the fact that it would have called attention that the illegal activities occurred after Snook's departure. (R. 314-1, at 2; R. 314-2, at 2-7). Counsel's decision is also reasonable considering the uncertainty as to whether Snook committed the alleged forgery, and consequently whether she committed perjury. *Leman*, 574 F. App'x at 704 ("Leman cannot prove that the statements were indisputably false . . . . Leman's assumption and inferences that 'Dr. Rowland would have had no reason to create a forgery, and that [b]ecause the prescription is a forgery, and because Snook's story makes no sense, the only conclusion is that Snook lied,' do not pass muster.").

It is also unclear how questioning Snook about the forgery (if it had been discovered earlier) or recalling Snook to question her about the forgery would have impacted the outcome of Leman's case. While Snook was undoubtedly a "key witness," (R. 300-1, at 12) she was one of many witnesses to testify that Leman was aware of the illegal activity occurring at his clinics. Leman's employee, Mr. Lyon, testified that Leman "had to know that anybody that was driving 12 hours a day, passing up another six or seven states to go pay $500 cash to see a doctor, that that

23

probably didn't pass the smell test." (R. 199, at 2503-04, 2532-34, 2577). Dr. Weiss testified Leman responded to his concerns about the high dosages being prescribed by telling him "[e]ither they're going to have to put every doctor who writes pain prescriptions in jail, and therefore nobody * * * that needs pain medication will ever get it, or they're going to have to back off." (R. 200, at 2772-75, 2860). Finally, Dr. Naramore testified Leman told him that if he did not want to prescribe a combination of methadone and Percocet, he would find someone else who would. (*Id.*).

Even if Leman's counsel did question Snook about the alleged forgery, it is unlikely this would have significantly undermined her testimony regarding Leman's awareness of what was happening at the clinic. Snook's damaging testimony included recalling when she brought up the identical MRI's to Leman, and he said "don't worry about it." (R. 142, at 32). Snook also testified that Leman told Dr. Crowder to "Take the G-D MRI's and write prescriptions, or you won't get paid." (*Id.* at 33); *see Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 848-49 (6th Cir. 2017) ("[a]ny minor inconsistencies [Defendant] now points out . . . could not possibly have changed the impact of [his] confession . . ."). Furthermore, not questioning Snook about the forgery while she was on the stand did not prejudice the Defendant, since evidence of Snook's forgery was presented to the jury through testimony of the Defendant's investigator and was argued during defense counsel's closing argument. (R. 185; R. 203, at 112-21).

Leman failed to demonstrate that counsel neglected to review all of the patient medical records, and even if counsel did not review all records, this failure was not unreasonable and did prejudice the Defendant. In addition, counsel's decision not to recall Snook constituted a reasonable judgment on how best to present Leman's case. For both claims, Leman failed to demonstrate a reasonable probability that the outcome of his case would have been different had counsel questioned Snook on the stand about the alleged forgery. She was not the only witness to

testify about Leman's knowledge of the clinics, it would not have significantly lessened the impact of her testimony, and counsel presented evidence of the forgery to the jury through other means.

## III.    EVIDENTIARY HEARING

Defendant requests an evidentiary hearing on his pending § 2255 Motion. (R. 300-1, at 15). However, an evidentiary hearing is not necessary in this case because there are no genuine issues of material fact in dispute and the record conclusively shows that Defendant is not entitled to any relief under 28 U.S.C. § 2255. *Amr v. United States*, 280 F. App'x 480, 485 (6th Cir. 2008) ("the court is not required to hold an evidentiary hearing if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."). "If the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Here, the record in this case conclusively demonstrates, as discussed above, that Leman is not entitled to the relief he seeks. Accordingly, no evidentiary hearing is required, and it will be recommended that Leman's request be denied.

## IV.    CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Federal Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if a defendant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (addressing issuance of a certificate of appealability in the context of a habeas petition filed under 28 U.S.C. § 2254, which legal reasoning applies with equal force to motions to vacate brought under § 2255). In cases where a district court has rejected a petitioner's

25

constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists would not debate the denial of Defendant's § 2255 claims or conclude that the issues presented are adequate to deserve encouragement to proceed further. *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it will further be herein **recommended** that a certificate of appealability be **denied** upon the District Court's entry of its final order in this matter.

## V.    CONCLUSION AND RECOMMENDATION

For the reasons stated herein, **IT IS RECOMMENDED** that:

1)    Defendant Leman's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by Person in Federal Custody (R. 300), be **denied**;

2)    Defendant's Motion for Evidentiary Hearing (R. 300-1) be **denied**;

3)    this matter be **dismissed** and **stricken** from the active docket of this Court; and,

4)    the issuance of a Certificate of Appealability be **denied** by the District Court in conjunction with the Court's entry of its final order in this matter.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Report and Recommendation, issued under subsection (B) of the statute. *See also* Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 8(b).

Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Court.  Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walkers*, 636 F.2d 947, 950 (6th Cir. 1981).

Dated this 16th day of July, 2018.



Signed By:

*Candace J. Smith*

**United States Magistrate Judge**

J:\DATA\habeas petitions\2255 R&R general\10-10 Leman R&R final.docx